IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


WILLIAM D. SOLLON,                    )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )    CA No. 02-1632
                                      )
THE OHIO CASUALTY INSURANCE           )
COMPANY and THE HARTFORD LIFE         )
INSURANCE COMPANY,                    )
                                      )
            Defendants                )


**MEMORANDUM**

Pending before the Court are Motions for Summary Judgment filed by Ohio Casualty Insurance Company ("Ohio Casualty") and by The Hartford Life Insurance Company ("Hartford.")  (*See* Docket Nos. 41 and 43, respectively.)  The Motion by Ohio Casualty is granted in its entirety; the Motion by Hartford is granted in part.  This matter is remanded for further consideration in light of the discussion which follows.

**I.    INTRODUCTION**

A.    Factual Background[1]

Beginning in July 1974, Plaintiff William D. Sollon was employed by Defendant Ohio Casualty, a property casualty insurance company.  As part of its employee benefits plans, Ohio

---

[1]  Unless noted, the facts in this section are undisputed.

Casualty offered a long term disability ("LTD") plan in which Mr. Sollon voluntarily participated throughout his employment ("the Plan.")  Ohio Casualty purchased an insurance policy for payment of LTD benefits for its qualifying employees from Hartford.

At the time of the events giving rise to this suit, Mr. Sollon worked out of his home near Pittsburgh, Pennsylvania, as a claims representative.  In October 1999, his cardiologist, Dr. David Burkey, recommended that due to his severe cardiac impairment, coronary artery disease, and other related conditions, he should quit working and apply for LTD benefits. On October 19, 1999, Mr. Sollon notified Ohio Casualty's home office of this recommendation and, following instructions from his employer, contacted Elizabeth Aumann, the Ohio Casualty Benefits Manager, for information about how to apply for LTD benefits.  Ms. Aumann told him that the Plan required him to first apply for Social Security disability benefits and that she would forward an application for LTD benefits.  Until those benefits could go into effect, Ohio Casualty placed him on a medical leave of absence.  Mr. Sollon subsequently received an application which he returned to Ohio Casualty for review and transmittal to Hartford for processing.  Plaintiff later received a letter from Ohio Casualty's benefits office advising him of the status of his LTD and other employee benefits in which it was stated, "Hartford is currently reviewing your claim for LTD

benefits.  We will notify you of Hartford's decision as soon as possible."  (Ohio Casualty Insurance Company's Brief in Support of its Motion for Summary Judgment, Docket No. 42, "Ohio Casualty Brief," Exhibit 1, Declaration of Elizabeth S. Aumann, "Aumann Decl.," Exh. 9.)

On May 15, 2000, Kimberly J. Polash, a claims examiner with Hartford, advised both the Ohio Casualty employee benefits office and Mr. Sollon that his LTD benefits claim had been approved as of April 20, 2000.  The letter to Mr. Sollon also noted that "benefit payments will continue, subject to the terms and limitations of the policy, while you meet the policy definition of Total Disability."[2]  (Aumann Decl., Exh. 10.)  Based on the terms of the Plan, Plaintiff received a monthly benefit equal to two-thirds of his base salary, less the amount he received as disability benefits from the Social Security Administration.

On September 27, 2000, Ms. Aumann received an e-mail from a colleague which stated, "Have heard rumblings that [Mr.] Sollon, who is on LTD since 10/19/99, has been playing golf at least two times a week at his country club and may also be the country club president.  Not sure how this relates to his LTD but thought we might want to check."  (Aumann Decl., Exh. 12.)  Ms. Aumann wrote to Ms. Polash at Hartford on September 29, 2000, advising her of

---

[2]  The definition of "Total Disability" is provided below in Section III.B.2.

this rumor, and asking that someone investigate and let Ohio
Casualty know what effect, if any, this had on Plaintiff's
disability claim.  Ohio Casualty contends that at no time did Ms.
Aumann offer any conclusions about whether Mr. Sollon's benefits
should be terminated, but merely passed the information along to
the party who made determinations about eligibility and paid the
benefits.  (Ohio Casualty Brief at 6.)

        In response to Ms. Aumann's letter, Hartford assigned an
investigator to contact Plaintiff's medical doctors regarding his
physical condition and began to re-evaluate his claim.  The
investigation included three days of surveillance in November,
2000, during which time Mr. Sollon was videotaped playing golf.
When asked about this by the investigator during a personal
interview on February 8, 2001, Mr. Sollon admitted he was the
person in the videotape.

        On September 25, 2001, Ohio Casualty was advised by letter
from Hartford that Mr. Sollon's LTD benefits under the Plan had
been terminated.  The letter stated that Hartford had completed
its review of the claim and "determined that the information
obtained does not support his claim of total disability from his
own occupation." (Aumann Decl., Exh. 16.)  Mr. Sollon received a
similar letter from Hartford, advising him that his benefits were
retroactively terminated as of November 8, 2000, the day he was
videotaped paying golf.  Although he appealed this decision to

Hartford as prescribed in the Plan, after further reviews, the termination was affirmed on January 31, May 28, and July 2, 2002.

B.   Procedural History

Mr. Sollon filed suit in this Court on September 24, 2002, claiming that the denial of his long term disability benefits by Defendants was a violation of the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), breach of the contract underlying the Plan, and violation of 42 Pa. Con. Stat. Ann. § 8371, the Pennsylvania Bad Faith Insurance Act.  In his complaint, Plaintiff sought restoration of his LTD benefits retroactive to September 2001, attorney fees and costs and "other relief that this Court deems appropriate, equitable and just under the circumstances." (Complaint, Count I.)

Ohio Casualty moved to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6) on November 15, 2002, arguing that Plaintiff had admitted that Hartford was solely responsible for the decisions regarding his eligibility for benefits, and that the state law claims for breach of contract (Count II) and violation of the Pennsylvania Bad Faith Insurance Act (Count III) were pre-empted by ERISA. (Docket No. 9.)  The motion was granted in part by order of Court on March 12, 2003, dismissing Counts II and III with regard to both Defendants. (Docket No. 16.)  The parties then conducted almost two years of discovery before Defendants

filed the Motions for Summary Judgment now pending.

     C.   <u>Jurisdiction and Venue</u>

     The parties agree that this Court has jurisdiction over Plaintiff's ERISA claims pursuant to 29 U.S.C. § 1132(e)(1). Venue is appropriate in this District inasmuch as the Plan is administered and the alleged violations occurred in this district.  29 U.S.C. § 1132(e)(2).

**II.  STANDARD FOR SUMMARY JUDGMENT**

     A court may grant summary judgment if the party so moving can show, based on "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,  . . . that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c)); <u>Rossetti v. Busch Entertainment Corp.</u>, 87 F. Supp.2d 415 (E.D. Pa. 2000).  If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material.  A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

     In considering a motion for summary judgment, the court must view all the evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and

resolve any conflicts in its favor.  <u>Rossetti</u>, <u>id.</u>, *citing*
<u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S.
574, 587 (1986), and <u>Big Apple BMW, Inc. v. BMW of North America,
Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).  In short, the movant
must show that if the pleadings, depositions and other
evidentiary material submitted to date were admissible at trial,
the opposing party could not carry its burden of proof based on
that evidence and a reasonable jury would thus decide all genuine
material disputes in favor of the movant.  <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 318 (1986).

Once the moving party has demonstrated that there are no
genuine issues of material fact, the burden shifts to the non-
moving party to "make a showing sufficient to establish the
existence of every element essential to his case, based on the
affidavits or by depositions and admissions on file."  <u>Celotex</u>,
<u>id.</u> at 322-23; <u>Rossetti</u>, <u>id.</u>; Fed.R.Civ.P. 56(e).  The evidence
to be presented by the non-moving party must be such that a
reasonable jury could find in its favor, and it cannot simply
reiterate unsupported assertions, conclusory allegations or mere
suspicious beliefs.  <u>Liberty Lobby</u>, <u>id.</u> at 250-252; <u>Groman v.
Township of Manalapan</u>, 47 F.3d 628, 633 (3d Cir. 1995).

**III. LEGAL ANALYSIS**

   A.   <u>Motion for Summary Judgment by Defendant Ohio Casualty</u>

        1.   *Arguments Raised by Defendant:*  Ohio Casualty

contends that Plaintiff's only claim against it is breach of fiduciary duty.  Defendant argues that although Plaintiff never explicitly states the basis for his claim, it is clear from the tenor of his pleadings that he is seeking to "recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  (Ohio Casualty Brief at 9, *citing* 29 U.S.C. § 1132(a)(1)(B) ("Section 502(a)(1)(B).")) Because the Third Circuit has held that "Section 502(a)(1)(B) is unavailable in actions for breach of fiduciary duty," Plaintiff fails to state a cause of action against Ohio Casualty, who should therefore be granted summary judgment.  (Ohio Casualty Brief, id., *citing* <u>Haberern v. Kaupp Vascular Surgeons Ltd.</u> <u>Defined Benefit Pension Plan</u>, 24 F.3d 1491, 1501 (3d Cir. 1994), *cert. denied*, 513 U.S. 1149 (1995).)

Secondly, Ohio Casualty argues that even if the Court were to decide that Plaintiff's claim under Section 502(a)(1)(B) were viable, such a claim would necessarily fail because it is undisputed that Ohio Casualty was merely Plaintiff's employer and the Plan sponsor, not a fiduciary.  (Ohio Casualty Brief at 10-13.)  Since a claim under Section 502(a)(1)(B) may be brought only against a plan or the plan fiduciary, and Ohio Casualty clearly is not "the Plan," it can only be held liable if it were the fiduciary.  Because the only issue herein is the decision to

terminate the LTD benefits and Plaintiff admits that Ohio
Casualty took no part in that decision, it could not be the
fiduciary "with respect to the particular activity at issue."
(Id. at 11, *quoting* Coleman v. Nationwide Life Ins. Co., 969 F.2d
54, 61 (4th Cir. 1992).)

Finally, Ohio Casualty argues that, contrary to Plaintiff's
assertions, it breached no fiduciary duty to him by delegating
its administrative responsibilities or by reporting his golfing
activity to Hartford.  (Ohio Casualty Brief at 13-14.)

We need not examine the first two arguments in detail
because, even if we assume without analysis that Ohio Casualty
was a fiduciary[3] with regard to the LTD Plan, Plaintiff has
failed to identify any duty owed to him as a Plan participant
which was breached by Ohio Casualty.

2.  *Plaintiff's Arguments:*  Plaintiff does not
disagree with Ohio Casualty's position that his only claim
against it is for breach of fiduciary duty.  However, he argues
that contrary to the assumption that his claim is based on
Section 502(a)(1)(B), he is relying instead on Section

_____

[3]  ERISA states that "[A] person is a fiduciary with respect to a
plan to the extent (I) he exercises any discretionary authority or
discretionary control respecting management of such plan or exercises
any authority or control respecting management or disposition of
assets, (ii) he renders investment advice for a fee or other
compensation, direct or indirect, or (iii) he has any discretionary
authority or discretionary responsibility in the administration of
such plan."  29 U.S.C. § 1002(21)(A).

502(a)(3)(B),[4] a "catchall provision" that provides "a safety net offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." (Plaintiff's Brief in Opposition to Motion for Summary Judgment by Ohio Casualty Insurance Company, Docket No. 51, "Plf.'s Opp. to Ohio Casualty," at 4-5, *quoting* <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 512 (1996).)  We will not analyze herein the delicate interplay of Sections 502(a)(1)(B) and 502(a)(3)(B)[5] because Plaintiff fails to establish that any action taken (or not taken) by Ohio Casualty resulted in an injury to him for which he could seek such equitable relief.

In response to Ohio Casualty's motion, Plaintiff argues first that Defendant breached a fiduciary duty to him as a Plan participant based on information provided

> in his Employee Benefits Manual . . . where . . . Ohio Casualty . . . informs the employees like Mr. Sollon, that they are fiduciaries and have a fiduciary responsibility towards Mr. Sollon as an employee participant.  This breach of fiduciary duty exists from the language of the Employee Benefits Manual and not necessarily under § 502(a)(1)(B) of ERISA.

---

[4]  Section 502(a)(3)(B) provides that "A civil action may be brought– . . . (3) by a participant . . . (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."  29 U.S.C. § 1132(a)(3)(B).

[5]  For such an analysis, *see*, e.g., <u>Great-West Life & Annuity Insurance Co. v. Knudson</u>, 534 U.S. 204 (2002), and the discussion thereof in <u>Skretvedt v. E.I. Dupont de Nemours</u>, 372 F.3d 193 (3d Cir. 2004).

(Plf.'s Opp. to Ohio Casualty at 4-5.)

The language from the Employee Benefits Manual[6] cited by

Plaintiff reads in full:

> You [the participant] also have the right to expect the
> people who are responsible for the operation of these
> Plans to act prudently and in the best interest of the
> Plan participants as a whole.  These people are called
> fiduciaries.  It is [Ohio Casualty's] policy that Plan
> fiduciaries act in the best interest of all Plan
> participants and that they will continue to do so.

(Plaintiff's Appendix in Support of His Briefs in Opposition to
the Defendants' Motions for Summary Judgment, Docket No. 50,
"Plf.'s App.," Employee Benefits Manual.)

Contrary to Plaintiff's position, nothing in this paragraph

establishes that Ohio Casualty is the fiduciary for the LTD

benefits plan.  Rather it simply states that "the people who are

responsible for the operation of these Plans" are the

fiduciaries.  The identity of those "people" is not made clear in

this paragraph.

Alternatively, Plaintiff argues that Ohio Casualty was a

fiduciary with regard to the LTD Plan based on two additional

---

[6]  Mr. Sollon claims that all his information regarding the LTD
Plan came from the Employee Benefits Manual.  (Plf.'s Opp. to Ohio
Casualty at 2.)  In the appendix to his brief, Mr. Sollon provides two
documents, one labeled "Employee Benefits Manual – ERISA Rights," and
the other "Employee Benefits Manual – Plan Administration and Service
of Legal Process."  However, he refers to the latter in his brief at
page 6 as the Summary Plan Description.  The Court has compared the
latter to the document referred to by Ohio Casualty as the "Summary
Plan Description" (Aumann Decl., Exh. 3) and concludes that the two
are identical.  In order to clarify which document contains the
information to which the parties refer, we shall refer to Mr. Sollon's
documents as the "Employee Benefits Manual" and the "Summary Plan
Description," respectively.

statements in the Summary Plan Description.  First "The Ohio Casualty Insurance Company administers the [LTD Plan] and acts as liaison with [Hartford] which is responsible for paying benefits under the Plan."  Second, Ohio Casualty states that it is the agent for service of process.  Plaintiff argues that these two statements confirm Ohio Casualty's role as both administrator and fiduciary.  (Plf.'s Opp. to Ohio Casualty at 6-7; Plf.'s App., Summary Plan Description, LTD-13.)

"Whether a defendant is a plan administrator is a factual question which requires an inquiry into the plan document and the factual circumstances surrounding the administration of the plan." Carducci v. Aetna U.S. Healthcare, 247 F. Supp.2d 596, 609 (D. N.J. 2003), *citing* Hamilton v. Allen Bradley Co., 244 F.3d 819, 824 (11th Cir. 2001).

In Vega v. National Life Ins. Servs. Inc., 145 F.3d 673 (5th Cir. 1998), the insurance plan summary identified the employer, not the insurance company, as the plan administrator.  Id. at 677 n.24.  Moreover, the agreement between the employer and the insurance company explicitly stated that the insurer was not "deemed to be a 'named fiduciary' or 'Plan Administrator' as defined by ERISA."  The court concluded that despite this language, the insurer "was indisputably the plan administrator and fiduciary with respect to paying insurance claims," based on the fact that claims were sent to the insurer on its own proof of

loss forms and it was responsible for paying such claims. Relying on the definition of "administrator" provided in 29 U.S.C. § 1002 (16)(A)(i), the Court concluded the insurer was "the person specifically so designated by the terms of the instrument under which the plan is operated."  Vega, id.

Similarly, in Bollenbacher v. Helena Chem. Co., 934 F.Supp. 1015 (N.D. Ind. 1996), the employer/defendant argued that it was not the administrator of the LTD plan in question since it had no administrative discretion over the plan.  Helena's employee benefits personnel described their responsibilities as purely ministerial, such as executing enrollment forms for new employees, paying the monthly premiums to the insurer, sending claims forms to employees "on rare occasions," disseminating information to employees about their benefits, providing the insurer with personnel information about claimants, and transmitting claim forms between the claimant and the insurer. Id. at 1022.  The court held that despite the fact that one of Helena's employees had expressed her opinion that Bollenbacher would not be entitled to disability insurance since he was no longer a Helena employee and no doctor had determined that he was disabled, these statements were merely an explanation of the rules determining eligibility for benefits or advice about a plan participant's rights and options under the plan, that is, "only ministerial functions."  Id. at 1024, distinguishing Varity Corp.

13

At her deposition, Ms. Aumann was asked how she interpreted the phrase "administers the LTD plan" in the Summary Plan Description.  She replied:

> What that means is we do such things as deduct contributions from employees' checks for the coverage. We submit the premium payment. . . . In the event an employee becomes disabled, we send the employee the claim forms, send the claims form to Hartford for determination and that type of thing.

(Plf.'s App., Deposition of Elizabeth Aumann at 18.)

Mr. Sollon attempts to distinguish <u>Vega</u> and <u>Bollenbacher</u> by arguing that in those cases, the employer exercised no discretionary authority over the plans.  The examples he provides of discretionary authority exercised by Ohio Casualty are (1) Ms. Aumann's testimony that she "was involved in the preliminary arrangements" concerning Mr. Sollon's application for LTD benefits; (2) seven e-mail memos "of the various personnel of Ohio Casualty indicating their involvement in spreading the information to each other of Mr. Sollon's golfing activities, as well as his decision to take retirement disability," and (3) the letter from Ms. Aumann to Ms. Polash reporting the golfing activities.  (Plf.'s Opp. to Ohio Casualty at 7-8.)

The Court has reviewed the excerpts of Ms. Aumann's deposition provided by Plaintiff and finds no reference to her involvement in "preliminary arrangements" for LTD benefits. Second, we fail to understand how the e-mail memos "spreading information" about Plaintiff's golfing activity reflect any

14

discretionary authority regarding his benefits and find that they
are, at most, an attempt to gather accurate information about the
situation.  With regard to Ms. Aumann's letter to Hartford
regarding the golfing activity, the fact that she asked Hartford
to investigate rather than directed the insurer to do so, and
inquired "what effect, if any" this had on his LTD benefits
rather than stating her opinion about the situation, supports a
conclusion that Ms. Aumann did not exercise any discretionary
authority concerning benefit decisions.  Moreover, her deposition
testimony reflects the fact that Ohio Casualty's role with regard
to the LTD Plan, like that of the employer in Bollenbacher, was
simply ministerial.

     "When employers themselves serve as plan administrators they
assume fiduciary status only when and to the extent that they
function in their capacity as plan administrators."  Hozier v.
Midwest Fasteners, Inc., 908 F.2d 1155, 1158 (3d Cir. 1990) We
find that despite language in the Summary Plan Description
stating that Ohio Casualty "administers" the LTD Plan, the facts
of this case support the conclusion, discussed in more detail
below, that Hartford, not Ohio Casualty, was the plan
administrator and fiduciary with regard to determining LTD
eligibility and paying such claims.

     Since we find that Ohio Casualty did not act as
administrator for the Plan, we turn to Plaintiff's vague claim

that Section 502(a)(3)(B) allows him to pursue a claim for breach of fiduciary duty against his employer.  Plaintiff's arguments in opposition to Ohio Casualty's motion for summary judgment are, in general, less than well articulated.  However, in an effort interpret his pleadings in the light most favorable to him as the non-movant at summary judgment, the Court has discerned three possible arguments with regard to the alleged breach of fiduciary duty by Ohio Casualty.

First, Plaintiff attempts to argue that Ohio Casualty breached its duty to him by implying that it was the fiduciary but then delegating decision making authority to Hartford. Plaintiff states:

> the fact that Ohio Casualty did not participate actively in the final decision-making process with The Hartford, in [and] of itself, was a breach of the fiduciary duty owning to Mr. Sollon.  At the very least, they could have contacted him and discussed with him his golfing activity, if they really thought that was a situation that would lend itself towards a termination of [LTD] benefits regardless of whether medically it was an appropriate decision by either of the Defendants.

(Plf's Opp. to Ohio Casualty at 8.)

Plaintiff also contends in his Pretrial Statement that Ohio Casualty representatives "by their inaction in their capacity as fiduciary acted arbitrarily and capriciously" with regard to termination of the LTD benefits.  (Ohio Casualty Brief, Exhibit 5, at 4-5.)

Such an argument must fail inasmuch as ERISA explicitly

allows for delegation of most fiduciary functions to third parties.  *See* 29 U.S.C. § 1105(c)(1), stating that "The instrument under which a plan is maintained may expressly provide for procedures . . . (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan."  *See also*, e.g., <u>Winkler v. Metro. Life Ins. Co.</u>, 340 F. Supp. 2d 411, 413 (S.D. N.Y. 2004), holding that although the benefit plan did not identify the insurer as a "named fiduciary" and did not specify a procedure under which the employer could designate a "named fiduciary" nor a procedure under which the employer could delegate fiduciary duties pursuant to 29 U.S.C. § 1105(c)(1), the insurer was "clearly a Plan fiduciary, given the description of its duties, although not identified by name."

Here, neither Ohio Casualty nor Hartford was identified in the Plan as the "named fiduciary."  But, as discussed in more detail below, the insurance policy between Ohio Casualty and Hartford clearly assigns responsibility for decisions regarding eligibility for benefits and for payment of those benefits to the insurer.  Moreover, we are unpersuaded by Plaintiff's argument that Ohio Casualty had a duty to discuss his golfing activity with him before reporting it to Hartford because there was the possibility that such information would lead to termination of his benefits, i.e., a duty to "stick up for him" as a Plan

17

participant.  Plaintiff has not cited – and independent research
has failed to identify – any case law standing for the
proposition that when an employer has delegated responsibility
for administration of a benefits program to another party, the
employer has a separate duty to discuss with the employee
information the plan administrator may use in making benefit
decisions potentially adverse to the plan participant.

Mr. Sollon next claims that Ms. Aumann breached a fiduciary
duty to him by suggesting that he take retirement disability.
(Plf.'s Opp. to Ohio Casualty at 8.) In support of this argument,
Plaintiff provides a declaration in which he states:

> All decisions with reference to the type of disability
> benefit I received, the amount of same, and any other
> decision pertaining to the amount of money to be
> received after I went on disability was recommended by
> Elizabeth S. Aumann. . . .  I relied exclusively on her
> recommendations.  In fact, Ms. Aumann specifically
> stated that I "would do better" taking retirement
> disability and not taking any money from my pension
> program.
>
> At all times pertaining to my decision to accept
> retirement disability . . . based upon the
> recommendations of Elizabeth S. Aumann, other than
> being advised that the amount of my Social Security
> Disability benefit payment would be placed in the
> equation to determine the exact amount of my [LTD]
> benefits, I was never advised by anybody from the Ohio
> Casualty Insurance Company of the effects of accepting
> any other form of benefit under my company Employees
> Retirement Plan on my rights to receive [LTD] benefits
> or the amount of same.

(Plf.'s App., Declaration of William D. Sollon, ¶¶ 9 and 11.)

The Court assumes that Plaintiff is arguing that he was not

aware that the LTD benefits paid to him by Hartford would be
further reduced when he began receiving disability retirement
benefits in addition to Social Security disability benefits.
This argument is foreclosed by at least two documented events in
which Mr. Sollon received precisely this information.

First, when he completed the application for benefits, Mr.
Sollon was asked to list "other income benefits you have
received/are receiving, or are eligible to receive during your
disability." (Plf.'s App., Application for Long Term Benefits.)
The form lists several potential sources of income – Social
Security retirement, Social Security disability, sick pay or
income from work, workers compensation, state disability, pension
retirement benefits, **pension disability benefits**, short term
disability, unemployment, no fault insurance, and "other." (Id.,
emphasis added.)

Second, Mr. Sollon was advised by Hartford on May 15, 2000,
in the letter informing him that LTD benefits had been approved,
that, "Should you receive, or become entitled to receive, **Other
Income Benefits due to your Disability or Retirement**, . . . .
please notify us at once so that we may determine whether such
income will have an effect on your LTD benefits." (Aumann Decl.,
Exh. 10, emphasis added.)

An ERISA fiduciary has "a duty to communicate complete and
accurate information about a beneficiary's status." In re Unisys

19

Corp. Retiree Medical Benefit "ERISA" Litig., 57 F.3d 1255, 1265
n.15 (3d Cir. 1995) (internal quotation omitted).  The failure of
an ERISA administrator to advise a plan participant about the
consequences of decisions about his benefit plans is cognizable
under Section 502(a)(3).  Jordan v. Federal Express Corp., 116
F.3d 1005, 1018 (3d Cir. 1997). To allege and prove a breach of
fiduciary duty for misrepresentations, a plan participant must
establish "(1) the defendant's status as an ERISA fiduciary
acting as a fiduciary; (2) a misrepresentation on the part of the
defendant; (3) the materiality of that misrepresentation; and (4)
detrimental reliance by the plaintiff on the misrepresentation."
Daniels v. Thomas & Betts Corp., 263 F.3d 66, 73 (3d Cir. 2001.)

Assuming for the sake of argument that Ms. Aumann, as an
agent for Ohio Casualty, was acting as a fiduciary when she gave
the above advice to Mr. Sollon, the Court concludes that there
was no breach of fiduciary duty with regard to the issue of
whether disability retirement payments would be considered Other
Income Benefits which would offset the amount paid by Hartford.
If Mr. Sollon relied on Ms. Aumann's representations in deciding
to accept disability retirement, there is no evidence that such
advice was in any way detrimental to him because the calculation
of disability benefits under the Plan clearly contemplates that
the total amount a plan participant receives each month from all

sources will equal two-thirds of his base salary at the time he is declared disabled, with the exception of increases in Social Security payments.  This fact is clearly spelled out in the Summary Plan Description which Plaintiff acknowledges he received.  Participants have a duty to inform themselves of the details provided in their plans (<u>Genter v. Acme Scale & Supply Co.</u>, 776 F.2d 1180, 1185 (3d Cir. 1985)), and when a plan participant possesses a written document notifying him of the conditional nature of benefits, "reliance on employer representations regarding benefits may never be 'reasonable.'" <u>In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig.</u>, 58 F.3d 896, 908 (3d Cir. 1995).  Therefore, to the extent that Mr. Sollon is arguing that Ms. Aumann breached a fiduciary duty to him by advising him to take disability retirement benefits which had the potential to reduce his LTD payments from Hartford, the Court concludes that because he was made aware on at least two occasions that this would be the case, no breach occurred.

Finally, Plaintiff attempts to argue that Ms. Aumann breached a fiduciary duty to him by starting the "ball in motion" with regard to the benefits termination decision by writing to Ms. Polash about the rumors he had been playing golf.  (Plf.'s Opp. to Ohio Casualty at 8.)  He claims that by writing this letter, Ms. Aumann was exercising "discretionary authority respecting management" or discretionary responsibility" with

regard to administration of the Plan.  (*Id.* at 5.)

Plaintiff cites no law to support the rather remarkable premise that Ohio Casualty violated its fiduciary duty to him by advising Hartford of activity which could have been deemed inconsistent with that of a person receiving LTD benefits.  To the extent Ohio Casualty was a fiduciary of the LTD Plan, such a relationship establishes a duty to the Plan itself and to all of its participants.  While it is true that ERISA requires a plan administrator or fiduciary to discharge his duties "solely in the interest of the participants and beneficiaries," it also requires him to act prudently with regard to financial management of the plan and to act "in accordance with the documents and instruments governing the plan."  29 U.S.C. § 1104(a).[7]  If we accept that Ms. Aumann was a Plan fiduciary, she had a duty to the Plan itself and to the other Plan participants to alert Hartford that it was possibly incurring unreasonable expenses in providing LTD benefits to someone who was not Totally Disabled.  *See* McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan, 340 F.3d 139, 142 (3d Cir. 2003) ("The plan administrator's duty to

_____

    [7]  ERISA Section 404 states in relevant part that: "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and- (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . "  29 U.S.C. § 1104(a)(1).

administer a plan for the sole benefit of its participants is qualified by his obligation to interpret a plan consistent with the documents and instruments governing the plan;") *see also* O'Neil v. Retirement Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55, 61 (2d Cir. 1994) (explaining that the plan administrator is not obligated to "resolve every issue of interpretation in favor of the plan beneficiaries.")

Because we conclude that Plaintiff has failed to establish any breach of fiduciary duty by Ohio Casualty in connection with the decision to terminate his LTD benefits or in connection with any other event surrounding his retirement, summary judgment is granted to Defendant Ohio Casualty.

B. Motion for Summary Judgment by
 Hartford Life Insurance Company

1. *Standard of Review of the Decision to Terminate Benefits:* As stated above, Section 502(a)(1)(B) allows a plan participant to bring suit to "recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." However, ERISA does not provide a standard of review to be used by the court when considering such actions. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997). The Supreme Court has established a general rule that those claims are "to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The Firestone Court also noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Id.

In Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000), the Third Circuit Court of Appeals attempted to clarify this "delphic statement," and held that a "higher standard of review is required when reviewing benefits denials of insurance companies paying ERISA benefits out of their own funds." Id. at 390. Having conducted an exhaustive review of the approaches used by other circuits, the Pinto Court concluded that it could find "no better method to reconcile Firestone's dual commands than to apply the arbitrary and capricious standard, and integrate conflicts as factors in applying that standard, approximately calibrating the intensity of review to the intensity of conflict." Id. at 393. Thus, a district court is to apply a "sliding scale method," and to modify the intensity of its review appropriately, that is, the less evidence there is of conflict on the part of the administrator, the more deferential the standard becomes. Id. at 393. See also Lasser v. Reliance Std. Life Ins. Co., 344 F.3d 381, 385 (3d Cir. 2003),

24

*cert. denied*, 541 U.S. 1063 (2004) (although both funding and administering a plan creates an "inherent structural conflict," in such cases, the correct standard of review is "at the mild end of the heightened arbitrary and capricious scale.")

Another factor to be considered in establishing the level of scrutiny is the existence of "procedural anomalies" in processing a beneficiary's claim.  <u>Pinto</u>, 214 F.3d at 394.  Where there is evidence of the insurer's failure to resolve inconsistencies in the record, selective self-serving use of, or failure to seriously consider, a treating physician's conclusions, or cursory analysis of medical reports, a court may justifiably conclude that the denial resulted from an inattentive or biased review process and therefore examine the decision with "a high degree of skepticism."  <u>Pinto</u>, <u>id.</u>; *see also* <u>McGuigan v. Reliance Std. Life Ins. Co.</u>, CA 02-7691, 2003 U.S. Dist. LEXIS 17593, *16-*22 (E.D. Pa. Oct. 6, 2003) (discussing and applying the <u>Pinto</u> procedural anomalies factors.)  Moreover, in determining the level of scrutiny to be applied, the district court examines each case on its facts, taking into account such things as "the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company."  <u>Pinto</u>, 214 F.3d at 392.  This does not imply, however, that the burden of showing that the administrator or fiduciary operated under a conflict ever shifts away from the

plaintiff.  Id.

The Third Circuit has held that cases in which employers pay an independent insurance company to fund, interpret, and administer a plan generally warrant a heightened standard of review.  See Bill Gray Enters. v. Gourley, 248 F.3d 206, 216 (3d Cir. 2001), *citing* Pinto.  Here, the evidence is clear that Hartford makes decisions pertaining to eligibility for benefits and funds those benefits.  Every document pertaining to the LTD benefits plan is consistent in this regard.  For instance, the Summary Plan Description states, "The Long Term Disability Plan is carried under a contract with the Hartford Life Insurance Company. . . . **All benefits under the [LTD] Plan are paid under the insurance policy**."  (Summary Plan Description at LTD-1, emphasis added.)  In order to make a claim for benefits, the participant is advised that Ohio Casualty will provide a claim form and a Physician's Statement which "must be completed and returned to the Company [i.e., Ohio Casualty.]  The completed forms are reviewed by the Company and sent to **the insurer, which then investigates your disability to determine whether or not you will receive benefits** from the Plan."  If benefits are denied, "you will receive. . . **a written explanation from the insurance company** detailing the reasons for the denial. . . . You have a **right to appeal that denial** by submitting a written application **to the insurance company** . . . . The **insurance company will**

26

**conduct a full and fair review of your appeal and notify you of
its decision**." (<u>Id.</u> at LTD-10, emphasis added.)  These statements
are consistent with the language of the insurance policy itself.
For example, Section III, Article 1.A of the policy provides that
Hartford pays benefits and Section V provides that Hartford not
only determines eligibility for benefits, but reviews and decides
appeals if benefits are denied.  (Aumann Decl., Exh. 2, Group
Long Term Disability Insurance Policy, "Insurance Policy.")

    Hartford argues that the de novo standard should apply
because "the Ohio Casualty Plan does not contain [the]
discretionary language" necessary to trigger any other standard
of review.  (Brief by Hartford Life Insurance Company in Support
of Motion for Summary Judgment, Docket No. 44, "Hartford Brief,"
at 14.)  Plaintiff contends that a heightened arbitrary and
capricious standard should apply.  (Plaintiff's Brief in
Opposition to the Hartford Life Insurance Company's Motion for
Summary Judgment, Docket No. 49, "Plf.'s Opp. to Hartford," at
8.)  The Court agrees with Mr. Sollon.

    The insurance policy which is the foundation of the Ohio
Casualty Plan conveys discretionary decision-making with regard
to numerous aspects of the LTD plan.  For instance:

> **The determination by The Hartford** as to an Insured
> Person's retirement date **shall be conclusive** with
> respect to such person (Section II, Article 2);

> The Hartford shall continue benefit payments while the

27

Insured Person remains continuously disabled until the earliest to occur of the following dates: (1) the date the Insured Person fails to furnish **proof of loss or refuses to be examined, as may be required by The Hartford** . . . . (Section III, Article 1);

**The Hartford may give written approval** of Rehabilitative Employment for a period of six months. Approval of the Insured Person's Rehabilitative Employment **may be extended by The Hartford** for additional periods of six months.  (Section III, Article 2);

**Written proof of loss due to disability must be furnished to The Hartford** within 90 days after the commencement of the period for which The Hartford is liable.  Subsequent written proofs of the continuance of such disability **must be furnished to The Hartford at such intervals as The Hartford may reasonably require. . . . The Hartford shall have the right to require** as part of the proof of loss (1) certification by the Insured Person as to any Other Income Benefits; and (2) **evidence satisfactory to it** that the Insured Person and his dependents, if applicable, have made application for all Other Income Benefits and have furnished all required proofs for such other benefits.  (Section V – Proof of Loss).

(Insurance Policy, emphasis added.)

As the Court of Appeals has pointed out, no "magic words," such as "discretion is granted ...", need be expressly stated in order for the plan to accord the administrator discretion to interpret plan terms" and determine beneficiary status "so long as the plan on its face clearly grants such discretion." <u>Luby v. Teamsters Health, Welfare, and Pension Trust Funds</u>, 944 F.2d 1176, 1180 (3d Cir. 1991), *quoting* <u>DeNobel v. Vitro Corp.</u>, 885 F.2d 1180, 1187 (4th Cir. 1989); *see also* <u>Marx v. Meridian Bancorp, Inc.</u>, No. 01-2918, 2002 U.S. App. LEXIS 5277, *11 (3d

Cir. Mar. 27, 2002) (unpublished opinion) *cert. denied*, 537 U.S. 885 (2002) (the discretion required to trigger the deferential arbitrary and capricious standard of review may be implied from the terms of the plan.)

A provision in a benefits plan requiring that a claimant provide the administrator with "satisfactory proof" of disability provides the necessary discretion to justify arbitrary and capricious review.  Landau v. Reliance Std. Life Ins. Co., CA No. 98-903, 1999 U.S. Dist. LEXIS 279, *8-*9 (E.D. Pa. Jan. 13, 1999).  The plan in this case explicitly provides that "evidence satisfactory to it" is to be provided to Hartford with regard to other income received by an LTD benefits recipient and that Hartford may "reasonably require" ongoing evidence of disability, including the right to physically examine the claimant "as often as it may reasonably require."  (Insurance Policy, Section V.) Furthermore, Hartford's brief is replete with references to actions it – not Ohio Casualty – took, first to determine that Mr. Sollon qualified for LTD benefits, then that he did not. None of the parties identifies a situation in which Hartford sought advice, approval, or even concurrence from Ohio Casualty in making or implementing those benefit determinations.

Therefore, we conclude that Hartford was the plan administrator and plan fiduciary with regard to termination of Mr. Sollon's LTD benefits.  Moreover, we conclude that because

Hartford was both the decision-maker and the funder with regard
to those benefits, a heightened arbitrary and capricious standard
should be applied to the decision to terminate his benefits, the
administrator's fact-based determinations, and the means by which
those decisions were reached.  As such, the Court will be
"deferential, but not absolutely deferential" to the analysis
applied by the plan administrator in reaching its decision.
<u>Pinto</u>, 214 F.3d at 393.

        Under the heightened arbitrary and capricious standard, the
Court may overturn Hartford's decision to deny benefits to Mr.
Sollon only if that decision is "without reason, unsupported by
substantial evidence or erroneous as a matter of law."  <u>Abnathya
v. Hoffmann-La Roche, Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993)
(internal quotation omitted.)  In making this determination, the
Court is instructed to "look to the record as a whole," that is,
to the "evidence that was before the administrator when he made
the decision being reviewed."  <u>Mitchell</u>, 113 F.3d at 440.  In
addition to the evidence used in making the decision in question,
the court may consider additional records which were reviewed as
part the administrative appeal.  <u>Knoblauch v. Metro. Life Ins.
Co.</u>, 315 F. Supp. 2d 636, 645 (M.D. Pa. 2004).

        One problem confronting the Court here is that the
administrative record provided by Hartford is incomplete.  The
proper action in light of an incomplete record would be to remand

                                30

the case to the administrator for supplementation.  <u>Hunter v.</u>
<u>Fed. Express Corp.</u>, CA NO. 03-6711, 2004 U.S. Dist. LEXIS 13271,
*41 (E.D. PA. July 15, 2004).  However, Plaintiff does not object
to these omissions nor provide evidence from which one could
infer that Hartford provided only those parts of the record which
supported its ultimate conclusion while omitting those that
favored Plaintiff.  Therefore, the Court will consider the
investigative file provided by Hartford, together with a few
documents provided by Plaintiff which can be identified as part
of that file.  However, the Court will not consider certain
documents submitted by Plaintiff such as a letter written by his
cardiologist on August 19, 2003, or a letter from Ms. Aumann to
Mr. Sollon's daughter dated March 11, 2005 (Plf.'s App.), nor the
report of Dr. Larry Hurwitz dated December 7, 2005 (Appendix to
Defendant The Hartford Life Insurance Company's Brief in Support
of its Motion for Summary Judgment, Docket No. 45, "Hartford
App."), all of which are clearly outside the scope of the
evidence on which the plan administrator relied in making the
decision to terminate Plaintiff's benefits.

      2.   *The Administrator's Review:*  In determining if a
decision was arbitrary and/or capricious, the first step is to
review the evidence upon which Defendant based its decision.

    After Ms. Aumann advised Hartford on September 29, 2000,
that Mr. Sollon was rumored to be playing golf on a regular

basis, the insurance company began to investigate whether Mr. Sollon was Totally Disabled as that term is defined in the Plan. The Plan provides two definitions of "Totally Disabled." The first applies during the two years and six months immediately following the date on which a plan participant is determined to be unable to perform his own occupation, that is,

> **Totally Disabled** shall mean, during the Qualifying Period[8] and the following twenty-four months of a period of disability, that the employee is unable, solely because of accidental bodily injury or sickness, to perform each and every duty pertaining to his occupation. . .

(Insurance Policy, Section I.)

Thereafter, "Totally Disabled" is defined as meaning that the Plan participant is "unable, solely because of accidental bodily injury or sickness, to engage in any occupation or employment for wage or profit for which he is or becomes reasonably qualified by training, education or experience." (Id.) Because Mr. Sollon's LTD benefits were terminated during the first two years following April 20, 2000, the day on which he began to receive those benefits, only the first part of the definition is relevant to our consideration of the termination decision.

One of the first steps in the Hartford investigation was to

---

[8] "Qualifying Period," another defined term of the Plan, meant the "first six months of any period of total disability." (Plf.'s App., 1999 LTD Plan Certificate Booklet, at 3.) In Mr. Sollon's case, the Qualifying Period was October 19, 1999, through April 19, 2000.

check a website where golfers post their scores and calculate
their handicaps.  This review showed that Plaintiff had played
golf numerous times between July and October 2000, sometimes
several days in a row and, on at least two occasions, played two
full rounds on the same day.  (Hartford App., Hartford
Investigative File, "HIF," 64-66.)  The next step was to
videotape Mr. Sollon on November 8, 2000, during which time he
was seen driving to a country club, swinging a golf club
vigorously, and bending over deeply from the waist.  (HIF 52-56
and video disc attached.)  From the video recording excerpts, it
appears that Mr. Sollon used a golf cart on the course and did
not carry his clubs or walk using a caddy.  The video
surveillance also showed that the following day Plaintiff drove a
short distance, went to a barber shop, stood outside to have a
cigarette, then ran additional errands in the same neighborhood,
including visits to a pharmacy and a golf pro shop.  (Id.)
Further investigation into Plaintiff's golfing activities showed
that he continued to play golf in April 2001 on at least six
separate occasions.  (HIF 64.)

The terms of the Plan allow Hartford to request periodic
updates related to a claimant's condition.  (Insurance Policy,
Section V.)  Mr. Sollon was personally interviewed by Hartford's
investigator on February 8, 2001.  (HIF 39-44.)  He reported to
the investigator that his disabling conditions included coronary

artery disease, two lower back injuries,[9] shortness of breath, arthritis, stress, depression and fatigue.  (Id. at 40.)  He stated that during the last two or three years in which he worked, he had constant chest pain and fatigue; he also reported receiving spinal blocks to relieve his back pain and that he had experienced episodes of suicidal feelings following heart surgery in 1991.  He reported that his back condition had become worse since he left work but that his cardiac condition was "about the same."  (Id. at 41.)  He described his job as requiring him to

> supervise personnel and perform in multi-line insurance
> claims. . . . deal with people and the public, . . .
> meet deadlines, do litigation work and make many high
> dollar decisions.  My work consisted of a lot of
> sitting, some walking, high stress, and office type
> work.  I also had some traveling at times.

(Id. at 40.)

In the same interview, he stated he could lift approximately 15 pounds; walk for "approximately 20 minutes at a slow to medium" pace; sit for approximately 20 minutes; reach forward and overhead; and climb at least 12 stairs.  He claimed he could not bend or twist well because of his back.  He reported he had difficulty concentrating because of his fatigue and medications.  He did not smoke cigarettes or drink alcohol.  (HIF 41.)  With

---

[9]  Mr. Sollon injured his back in an automobile accident in 1985 and re-injured it in 1999 lifting boxes during the relocation of the Pittsburgh Ohio Casualty Office.  (HIF at 40.) There is no reference to back pain in Mr. Sollan's application for LTD benefits or in the attending physician's statement of disability completed by Dr. Burkey. (Plf.'s App., Application for LTD Benefits.)

regard to his social and physical activities, he stated he did water aerobics and walked a treadmill several times a week.  He stated he "played golf a couple of times last year," but found it "frustrating" that he could not play as well as he had in the past because he was unable to twist.  (Id.)  He reported he had "good days and bad days" due to his back and heart condition, "especially when I get upset."  (HIF 43.)  He stated he could not return to his previous job because "I have constant chest pain and chronic fatigue.  I cannot sit or stand for long periods of time due to back pain.  I have problems with my concentration and fatigue.  My medications dull my senses."  (HIF 44.)

The interviewer stated in his own notes that he "had to prod [Mr. Sollon] to admit that he did play a few times (meaning 2 times) last year, but he could not swing a golf club."  (HIF 45.) According to the investigator's notes, when Mr. Sollon was shown the videotape of his activities in November 2000, he admitted that he was the person depicted, but "could not believe he could swing a golf club like shown on the video," nor did he remember smoking.  (HIF 45.)

Plaintiff claims that Hartford terminated his benefits based on this videotape investigation.  (Plf.'s Opp. to Hartford at 4.) However, this is not strictly true.  Hartford stated in the benefits termination letter dated September 25, 2001, that it had reviewed a total of 17 sources of information, including reports

from his cardiologist, psychiatrist, and orthopedist; the Social Security disability award letter; a questionnaire Plaintiff completed on January 10, 2001; a physical demands analysis of his position as claims representative provided by Ohio Casualty; two physical capacities evaluations completed by his cardiologist, Dr. Burkey, and orthopedist, Dr. Platto, in July 2001; and an attending physician's statement completed by Dr. Burkey on August 17, 2001.  (HIF 59.)

In the termination letter, Hartford summarized medical information from three of Plaintiff's five doctors.[10]  The first notes from Dr. Scott Gleditsch, his psychiatrist, dated from December 3, 1999.  Dr. Gleditsch indicated on December 30, 1999, that Plaintiff was suffering from major depression but no personality disorder.  He noted that Plaintiff's perception was intact; he was oriented with some decrease in recent memory; his concentration, insight, and judgment were good.  (HIF 61, 109, 111.)  As of October 25, 2000, Dr. Gleditsch reported that Mr. Sollon was "free of the experience of depression and [was] enjoying life."  (HIF 61.)  In his report dated February 28, 2001, the last substantive psychiatric report in the record, he

---

[10]  Mr. Sollon identified two other medical providers at the February 8, 2001, interview – a neurologist, Dr. E. Richard Protsko, and Dr. David Mittell, a family practitioner.  (HIF 43.)  Nothing in the record indicates whether they were contacted by Hartford for medical opinions or provided any such information.  Plaintiff does not object to the fact that Hartford's investigative file fails refer to these physicians.

noted that Plaintiff's perception was intact and that his recent memory, concentration, insight, and judgment were all good; he was "mildly depressed but not suicidal."  (Id.)

Dr. Burkey reported on May 13, 2000, that Plaintiff was "doing well from a cardiovascular standpoint."  He completed a physical capabilities evaluation ("PCE") on July 10, 2001, in which he reported that Plaintiff could sit or drive for 1-2 hours at a time; stand for 30 minutes at a time; walk "as tolerated;" occasionally lift 21 to 50 pounds; and occasionally climb, balance, stoop, kneel, crouch, and crawl, reach, handle, finger and feel.  He also reported that Mr. Sollon's cardiac condition would cause him to fatigue easily and that he did not believe Plaintiff could work at his prior occupation.  (HIF 61; PCE at 413-414.)

Dr. Michael Platto, an orthopedist, reported that as of May 1, 2000, Plaintiff complained of low back pain in his left leg and ankle.  (HIF 62.)  Dr. Platto's diagnosis was degenerative joint disease of the lumbar spine for which he prescribed medication and exercise.  He completed a PCE on July 19, 2001, in which he noted that Plaintiff could sit for eight hours a day in two-hour periods, stand and walk for up to three hours a day in 30 minute increments; lift up to 20 pounds; climb, stoop, kneel, crouch and reach occasionally; and balance, handle, finger, and feel on a frequent basis.  (Id.)

37

On January 4, 2000, an unidentified regional vice president completed a physical demands analysis form with regard to Mr. Sollon's job as a claims representative.  (Hartford App., Deposition of John Fleming, Exh. 3, HIF 490-491.)  In summary, the job was described as sedentary, that is,

> Lifting 10 lbs. maximum and occasionally lifting and/or carrying such articles as dockets, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(Id. at 491.)

Since Hartford's investigation showed that Mr. Sollon had begun playing golf again in April 2001, the insurance company asked Drs. Burkey and Gleditsch to provide it with updated medical information to support Mr. Sollon's contention that he was physically unable to work as a claims representative.  (HIF at 62.)  Dr. Gleditsch did not provide a substantive response; Dr. Burkey provided an attending physician's statement dated August 17, 2001, in which he noted "normal clinical findings," no mental or nervous impairment, and that Plaintiff's physical impairment was "moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity."  While he found Mr. Sollon's prognosis fair or poor, Dr. Burkey concluded that he was "a viable candidate for vocational rehabilitation or job retraining."  (Hartford App., Burkey

Deposition, Exh. 12, HIF 394-395.)

All of this information was summarized in the letter sent on September 25, 2001, concluding that because the medical evidence supported a conclusion that Plaintiff could perform the requirements of his sedentary occupation, he was not Totally Disabled. (HIF 62.) Hartford therefore terminated Mr. Sollon's long-term disability benefits retroactively to November 8, 2000, the date on which he was first observed playing golf. The same letter advised Mr. Sollon of his right to appeal this decision. (HIF 63.) Mr. Sollon responded via his attorney on October 1, 2001, indicating that he intended to appeal. (HIF 351.)

On January 31, 2002, Hartford wrote to Plaintiff's counsel, stating that as part of the appeals process, it had reviewed additional information provided by Plaintiff on October 1, October 24, November 28, and December 5, 2001, along with a letter dated December 4, 2001, from Dr. James Nicotero, and letters dated November 16 and December 13, 2001, from Dr. Gleditsch. (HIF 334.) With regard to Dr. Nicotero's letter, Hartford noted that he had provided "no clinical evidence or documentation to support his opinion" that Mr. Sollon could not be gainfully employed, nor did he provide evidence to contradict the conclusions of Drs. Burkey and Platto that Plaintiff could work in a sedentary capacity. (Id.) The two letters from Dr. Gleditsch did not provide any evidence or documentation to

39

indicate that Plaintiff's depression limited his ability to work in a sedentary capacity.  (HIF 335.)  Hartford advised Plaintiff that its review of these materials, along with the information previously in his file, had not changed the insurer's decision that Mr. Sollon was not Totally Disabled.  Hartford advised Mr. Sollon once more of his right to appeal its decision, and stated that if it received such an appeal, it would "again review [his] entire claim."  (HIF 335.)

In a follow-up letter dated February 14, 2002, Mr. Sollon's attorney stated that the decision to terminate Plaintiff's LTD benefits "blatantly fails to give proper credence to the reports of the treating physicians and consultants and especially the report of James A. Nicotero, M.D., dated December 4, 2001."  (HIF 332.)  Hartford then retained an independent medical reviewer, Jason Mercer, of the University Disability Consortium, a specialist in internal medicine, to perform a complete re-evaluation of the claim.  (HIF 249.)

Dr. Mercer attempted to directly contact Dr. Burkey three times but was unsuccessful.  (*See* medical record review dated April 3, 2002, HIF 275-284.)  He summarized Dr. Burkey's records from October 18, 1999, through August 17, 2001, and noted that in the last report, the cardiologist had indicated that Mr. Sollon was subject to "moderate limitation of functional capacity." (HIF 281.)  He also reported that there had been "no significant

interval changes" in the results of a nuclear heart scan done in February 1999 as compared to the same test done in February 1995. (Id.)  Dr. Mercer spoke directly to Dr. Platto and reviewed his records from May 2000 through December 2001, when he described Mr. Sollon's condition as "over all stable."  (HIF 282.)  Dr. Mercer found "no medical evidence to support [a conclusion] that stress would exacerbate the claimant's current cardiovascular condition."  (HIF 283.)  He also reviewed the letter from Dr. Nicotero, but gave this report little weight inasmuch as Dr. Nicotero did not provide any physical examination results, clinical records or other medical documentation to support his views.[11]  (HIF 281.)  Dr. Mercer further noted that when Mr. Sollon was interviewed on February 8, 2001, he had described successfully performing activities consistent with a sedentary exertion level. (HIF 283-284.)  Dr. Mercer concluded, once again, that Mr. Sollon was not Totally Disabled.

Independent of Dr. Mercer's review, Hartford also re-contacted Dr. Gleditsch on April 11, 2002, requesting results of any psychological or cognitive testing and reports of visits from March 1, 2001, through the date of the request.  In his response, Dr. Gleditsch did not address the request regarding functional impairments, and stated that Hartford already had the existing

---

[11]   The Court notes that although Plaintiff refers to Dr. Nicotero as a treating physician, his name is not included among the medical providers listed by Plaintiff as of February 8, 2002.  (HIF 43.)

documentation.  From this, Hartford concluded that there was no
evidence of psychological impairment after February 28, 2001, the
date of Dr. Gleditsch's last report.  (HIF 250.)

Plaintiff was advised of Hartford's decision not to
reinstate his LTD benefits on May 28, 2002.  (HIF 248-251.)
Despite a statement in the letter that Hartford was closing its
claim file and would not conduct any further review, Mr. Sollon
appealed for a third time on June 3, 2002, providing the results
of a stress test performed on October 8, 2001, and a heart
catheterization on April 20, 2002.  (HIF 245.)  Hartford wrote to
Dr. Burkey on June 12, 2002, advising him that Dr. Mercer would
be contacting him "for clarification of Mr. Sollon's medical
condition and functional status," and urging the cardiologist to
speak with its consultant to "help ensure a full and fair review"
of Mr. Sollon's claim.  (HIF 234.)

On July 2, 2002, Hartford advised Mr. Sollon that Dr. Mercer
had reviewed the results of the exercise stress test and heart
catheterization.  (HIF 216.)  It reported that Dr. Mercer had
attempted to contact Dr. Burkey by telephone on three occasions
between June 18 and 20, 2002, but did not receive a response.[12]
(HIF 221.)  From the results of the October 2001 stress test, Dr.
Mercer concluded that Plaintiff's cardiac ability "well exceeds

---

[12]  Dr. Mercer also wrote to Dr. Burkey on June 25, 2002 (HIF 224-
225), but according to Hartford's letter of July 2, 2002, did not
receive a response.

the level of activity necessary to perform the duties of a
sedentary occupation" in that he had been able to achieve an
output of 7 METS.  Based on the medical records available, he
concluded that while Plaintiff

> does have advancement of his coronary artery disease,
> there is no evidence to support a level of impairment
> that would have prevented [him] from performing the
> duties of his occupation during the year 2000.  His
> activities such as playing golf and his performance on
> the stress test in October 2001 both support this
> opinion, as the level of activity required for both
> these activities well exceeds that necessary to perform
> the duties of a claims representative.

(HIF 223.)

Therefore, Hartford declined to change its previous
determination that Mr. Sollon was not Totally Disabled as of
November 8, 2000.  (HIF 216; 219-223.)

    3.    *Plaintiff's Arguments Opposing Summary Judgment:*
Plaintiff first takes issue with the description of his position
as a relatively low stress, sedentary job.  (Plf.'s Opp. to
Hartford at 3.)  At his deposition, he described "constant
fighting with the public," restrictions on his activities by the
Ohio Casualty home office, unreasonable reporting demands, and a
lack of assistance and support from the home office.  (Plf.'s
App., Plaintiff's Deposition at 38-46.)  He contends that
Hartford granted his LTD benefits based only on his cardiac
condition and failed to take into consideration the "established
medical principal [sic] that emotional stress, whether real or

perceived, has an adverse effect on pre-existing Cardiac Disease, having nothing to do with physical exertion." (Plf.'s Opp. to Hartford at 3-4 and Plf.'s App., Deposition of James Nicotero, M.D., at 40.) He states that Dr. Nicotero "was satisfied that Mr. Sollon had a stressful position" and that "from a Cardiovascular point of view, Mr. Sollon was disabled." (Plf.'s Opp. to Hartford at 4.)

The Court concludes that, contrary to Mr. Sollon's argument, Hartford did consider the effects of stress on his ability to work as a claims representative, once Mr. Sollon provided information about this factor during the course of his first appeal. The decision to grant Mr. Sollon LTD benefits as of April 2000 was not based on any claim of mental impairment or exacerbation of his cardiac condition due to stress because, it appears from the record, Mr. Sollon never made such a claim. Dr. Burkey's attending physician's statement submitted in March 2000 did not refer to job-related stress and he checked a box indicating that he regarded Plaintiff to be "essentially good functioning in all areas. Occupationally and socially effective." (Plf.'s App., Application for Long Term Disability.) In the application for benefits completed in February 2000, Mr. Sollon was asked, "What aspect of your job made you unable to work?" He responded, "Chest pain and fatigue." (Id.) When asked if his condition were related to his occupation, he checked

"no."  (Id.)  He did not list his psychiatrist, Dr. Gleditsch, among the physicians he had consulted in the prior three years. The first psychiatric records from Dr. Gleditsch date from December 1999, after Mr. Sollon had already been granted medical leave by Ohio Casualty, and reflect only that Mr. Sollon was upset with the way his demotion had been handled.  That is, there is nothing in the psychiatrist's notes from which one could infer that Mr. Sollon considered the job itself to be stressful. Moreover, Dr. Gleditsch never provided objective evidence such as a GAF score[13] from which one could conclude Plaintiff was unable to function as a claims representative due to job-related stress.

Plaintiff further claims that Hartford has misrepresented the nature of his occupation and his day-to-day activities because it relies on the deposition testimony of John Fleming, a senior litigation handler for Ohio Casualty.  Mr. Sollon claims that this person never worked with him and knew nothing about the workload or the stress to which he was subjected.  (Plf.'s Opp. to Hartford at 2-3.)  This argument misses the point.  There is

_____

[13]  A Global Assessment of Functioning or "GAF" analysis is a measurement tool that evaluates the psychological, social, and occupational functioning levels of an individual.  See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994).  The GAF scale ranges from 0 to 100 and is divided into ten categories which reflect the individual's impairments in several functional areas such as work, school, family relations, judgment, thinking and mood.  The categories are described as "some impairment," "moderate impairment," "major impairment," "serious impairment," etc.  Lozada v. Barnhart, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004.)

no evidence that Mr. Fleming was involved in the preparation of
the physical demands analysis completed by Ohio Casualty in
January 2000 and subsequently compared to the physical
capabilities questionnaires submitted by Plaintiff's physicians.
More importantly, although Mr. Fleming was asked at his
deposition about the content of the physical demands analysis,
there is no evidence that his opinions were considered by
Hartford as part of its decision-making process.  Thus, his
deposition testimony per se is not within the scope of this
Court's review.

     Plaintiff also argues that both of his treating physicians,
Dr. Burkey and Dr. Nicotero, recommended that he be considered
disabled.  (Plf.'s Opp. to Hartford at 4.)  For unknown reasons,
Dr. Burkey did not respond to repeated requests from Hartford for
additional medical information after August 17, 2001.  It is
unclear from the record if he performed and/or interpreted the
October 2001 stress test, but it is clear that Dr. Mercer
considered this test in his second report completed on June 25,
2002.  Moreover, although Dr. Burkey concluded that Mr. Sollon
was "disabled," the Hartford review concluded that this
conclusion was inconsistent with his other reports that Plaintiff
could perform at a sedentary level.  With regard to Dr. Nicotero,
although Plaintiff refers to him as a "treating physician," there
is no evidence that Mr. Sollon consulted with him on more than

two occasions.  Although he provided a report concerning Mr.
Sollon's cardiac condition on July 20, 1999 (Plf's App., Reports
of Dr. James Nicotero, HIF 492-493), his letter referred only to
tests which were done on February 12 and March 31, 1999, showing
"incontrovertible coronary artery disease," a conclusion with
which Hartford did not disagree.  Dr. Nicotero also noted that
"further discussion of circumstances at work suggest to me that
he is undergoing intense stress in the workplace, and that this
is a major factor in producing most of his current symptoms
involving tightness in his chest, easy fatigability and
depression."  The second letter from Dr. Nicotero, dated December
4, 2001, indicates that it was written in response to the
decision to terminate Mr. Sollon's benefits.  It discusses only
Dr. Burkey's evaluation, from which Dr. Nicotero concludes that
Plaintiff "is definitely living on borrowed time, and he knows
it."  (Id., HIF 342.)  He also states that "as a direct
consequence" of Mr. Sollon's job, he "suffered the relentless
terror of numerous Angioplasties, a Heart Attack and the
subsequent Coronary Bypass."  He concludes that the "modest
effect" of golfing is therapeutic and that it "seems so
destructive and mercenary to terminate his benefits as a
punishment for his enjoyment of this one single thing that he can
do as therapy."  (Id., HIF 343.)  He concludes that Mr. Sollon's
"many serious medical problems" do not allow him to maintain any

kind of gainful employment" and that his LTD benefits should therefore be reinstated.  (Id.)

There is no evidence that Dr. Nicotero personally examined Plaintiff in connection with writing this second letter or that he reviewed the results of any physical examinations such as the October 2001 stress test.  Moreover, while Dr. Nicotero (who practiced internal medicine and nephrology as well as cardiology), was certainly entitled to opine generally about the effects of work-place stress on an individual's cardiac condition, he provides no basis for his conclusion that Plaintiff's "emotional and psychological pathology" was "a direct consequence of his job."

While Plaintiff does not go so far as to argue that Hartford should have given special weight to the opinions of his treating physicians, such an argument has been foreclosed by the Supreme Court in Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003).  There, the Court held "plan administrators are not obliged to accord special deference to the opinions of treating physicians."  While

> [p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Id. at 834.

Here, the record is clear that Hartford did not arbitrarily refuse to credit the opinions of Drs. Burkey and Nicotero, it simply did not find that the objective medical evidence supported their conclusions that Plaintiff was Totally Disabled.  The plan administrator has a duty to resolve factual disputes, including those in the medical record.  Mitchell, 113 F.3d at 439. Moreover, a plan administrator does not abuse its discretion when it resolves such conflicts by concluding that a claimant is not disabled.  Johnston v. Hartford Life & Accident Ins. Co., CA No. 03-3336, 2004 U.S. Dist. LEXIS 16683, *28 (E.D. Pa. Aug. 19, 2004), citing Nichols v. Verizon Communications, No. 02-3521, 2003 U.S. App. LEXIS 21207(3d Cir. Oct. 20, 2003) (unpublished opinion).

Next, Plaintiff claims that the decision by Hartford to terminate his benefits fails to meet the heightened arbitrary and capricious standard because Hartford never required an independent physical examination, despite a provision in the LTD policy which specifically allows the insurer to do so at any time.  (Plf.'s Opp. to Hartford at 7.)  Thus, he claims, no physician "ever refuted the position of Mr. Sollon's physicians based upon a physical examination" that he was unable to work as a claims representative. (Id. at 8.)  He also claims that this failure to have him examined by another physician is evidence of

"self-dealing" by the insurance company.  (<u>Id.</u> at 9.)

A plan administrator does not have a duty to gather information in addition to that submitted with the claim.  <u>Pinto</u>, 214 F.3d at 394, n.8.  Moreover, numerous courts in this circuit have held that there is no legal requirement for a plan administrator to demand an independent medical examination as part of its review of a claim for disability benefits under an ERISA-governed plan, even if the plan permits it to do so.  *See*, e.g., <u>McGuigan</u>, 2003 U.S. Dist. LEXIS 17593 at *20 ("<u>Pinto</u> makes clear that an insurance company is under no specific duty to gather [medical] information"); <u>Stith v. Prudential Ins. Co.</u>, 356 F. Supp.2d 431, 440 n.3 (D. N.J. 2005); <u>Leonardo-Barone v. Fortis Benefits Ins. Co.</u>, CA No. 99-6256, 2000 U.S. Dist. LEXIS 19001, *34 (E.D. Pa. Dec. 29, 2000) (refusal to conduct independent medical examination did not render administrator's decision arbitrary and capricious, despite provision in policy that permitted it to conduct such an examination.)

Next, Plaintiff alludes to the fact that he was awarded disability benefits from the Social Security Administration.  He argues that his situation is "quite similar" to <u>Pinto</u> in that both he and Pinto claimed disability as a result of cardiac conditions.  He implies that the fact that he was granted Social Security disability benefits while Pinto was not is further evidence that Hartford unjustifiably terminated his LTD benefits.

50

(Plf.'s Opp. to Hartford at 8-9.)

As the Supreme Court has recently held, there are "critical differences" between the Social Security disability program and ERISA benefit plans. Black & Decker, 538 U.S. at 832. Social Security is an obligatory, nationwide program, whereas private employers are under no duty to establish employee benefits plans and may design such voluntary plans to meet self-determined goals. Id. at 833. When a private employer does decide to establish a benefit plan, it has greater leeway in designing it. Id. In addition, as Plaintiff points out in his quotation of the basis on which the Social Security Administration grants disability benefits,[14] that analysis takes into account an applicant's age, education and work experience, none of which figures into Hartford's definition of Total Disability for the first two years.

Plaintiff argues that the physical capacity evaluation forms requested only information concerning his ability to sit, stand and lift. He argues that if he "were a dock worker or a construction worker, such information would be appropriate."

---

[14]   Under 42 U.S.C. § 423, an applicant for Social Security benefits is considered disabled if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for the work."   (Plf.'s Opp. to Hartford at 8-9.)

However, since the basis of his disability was his cardiovascular disease, these analyses of his physical capabilities are irrelevant.  (Plf.'s Opp. to Hartford at 4.)  He further contends that Hartford "self-servingly selected to take Mr. Sollon's doctors' statements regarding functional capacity (not Cardiac capacity) to mean that he could perform his job, yet they chose to ignore the same physicians' conclusion that Mr. Sollon was totally disabled from a Cardiovascular point of view."  He argues that "the issue is not whether [he] could functionally perform the physical duties of his job, but whether he could perform his job from the stand point of his Cardiovascular status."  He claims that Defendant terminated his benefits "without having a single shred of evidence that Mr. Sollon was not disabled from a Cardiovascular, rather than a physical point of view."  (Plf.'s Opp. to Hartford at 9-10.)

Plaintiff does not explain how "cardiac capacity" differs from "functional capacity" and does not cite any case law which makes this distinction.[15]  In fact, the Court is not quite sure what Plaintiff means by the phrase "cardiac capacity" since the term is not apparently recognized as a medical term of art.  *See,* for instance, http://medlineplus.gov, a web-site created by the

---

[15]  As a matter of fact, the Court was able to identify only one reported case in any circuit which used the phrase "cardiac capacity," that is, Howard v. Bowen, 664 F. Supp. 923 (D. N.J. 1987), where it was used without definition.

National Institutes of Health; neither the on-line dictionary nor encyclopedia contains the phrase "cardiac capacity" or any obvious variation thereof.  Moreover, in analogous cases in which claimants seek Social Security disability benefits based on cardiovascular conditions, functional capacity analyses are routinely used to indicate the applicant's ability to work.  That is, there is no special "cardiac capacity" test used to determine disability in those cases.  *See*, e.g., <u>Owens v. Barnhart</u>, CA No. 03-5606, 2005 U.S. Dist. LEXIS 4515 (D. Minn. Mar. 22, 2005); <u>Johnson v. Barnhart</u>, No. 03-2902, 2004 U.S. Dist. LEXIS 27071 (W.D. Tenn. Sept. 29, 2004); <u>Aronson v. Apfel</u>, CA No. 97-7375, 1998 U.S. Dist. LEXIS 22560 (E.D. Pa. Dec. 17, 1998).

Review of the reports prepared by Dr. Mercer on which Hartford based its decision shows that he thoroughly analyzed Dr. Burkey's comments regarding Plaintiff's cardiovascular condition and those of Dr. Nicotero regarding the effect workplace stress had on his cardiac condition.  In addition, Dr. Burkey did not conclude that "Mr. Sollon was totally disabled from a cardiovascular point of view," as Plaintiff argues.  As late as August 17, 2001, Dr. Burkey stated that Plaintiff was only "moderately" limited and a "viable candidate" for job retraining. Between September 25, 2001, and July 2002, Dr. Burkey was offered multiple opportunities to support Plaintiff's claim of total disability due to his cardiovascular condition, but failed to

provide any substantive medical reports or even opinion after
August 17, 2001.

Under the arbitrary and capricious standard of review, "a
plan administrator's decision will be overturned only if it is
clearly not supported by the evidence in the record or the
administrator has failed to comply with the procedures required
by the plan." Abnathya, 2 F.3d at 41. Plaintiff has argued that
Hartford's decision to terminate his benefits was arbitrary and
capricious, but he has not come forth with evidence to support
that argument. Although there is evidence in the record from
which the plan administrator could have concluded that Mr. Sollon
was disabled, there is an equal if not greater quantum of
evidence to show that he was not disabled from performing his
sedentary occupation of claims representative. Plaintiff does
not argue, and the record does not reflect, that Hartford failed
to comply with the procedures for a full and fair review of his
benefits denial. The Court is satisfied that the decision to
terminate Plaintiff's benefits is not "without reason,
unsupported by the evidence or erroneous as a matter of law."
Abnathya, 2 F.3d at 45.

Summary judgment will therefore be granted to Hartford as to
the decision to terminate Plaintiff's long term disability
benefits. However, we conclude that the date on which those
benefits were terminated was arbitrary and capricious.

54

In its termination letter, Hartford explicitly stated that its decision was "based on Policy language and all of the documents contained in your claim file, viewed as a whole." (Hartford App., HIF 59.)  This statement was repeated in its letter of January 31, 2002, where it referred to the "complete list of the pertinent documents we used in making our decision." (HIF 334.)  The last document in the list of 17 documents is a report from Dr. Gleditsch dated August 27, 2001, in response to Hartford's request for an opinion on Mr. Sollon's physical condition and ability to play golf.  That response, however, provided no substantive content, but simply stated that Hartford should "consult with his physical doctor for documentation of his physical limitations."  (HIF 335.)  Dr. Burkey submitted an attending physician's statement on August 17, 2001, in which he described Plaintiff as capable of performing sedentary work. (HIF 62.)

Hartford advised Plaintiff that the "weight of evidence" showed he was not disabled as of November 8, 2000, but the only evidence accumulated as of that date was the videotape of him golfing on one occasion and the website showing that he had played golf the previous summer and fall.  As of November 8, 2000, Hartford had not yet reviewed any medical reports, consulted with any physicians, reviewed the physical demands checklist provided by Ohio Casualty, or interviewed Mr. Sollon.

We conclude it was arbitrary and capricious to terminate Plaintiff's LTD benefits as of November 8, 2000, when the body of evidence on which Hartford claims to have based its decision was not complete until August 17, 2001.

We will therefore remand this matter to Hartford for recalculation of Plaintiff's LTD benefits payable from November 8, 2000, through August 17, 2001.

      C.    <u>Other Matters</u>

      1.   *Failure to Exhaust Administrative Remedies:*
Hartford argues that it is entitled to judgment in its favor with regard to its position that Plaintiff cannot recover benefits for any period other than the first two years following April 20, 2000.  (Hartford Brief at 18-19.)  As Hartford points out, during this period, Total Disability was defined as a plan participant's inability to perform his own occupation; thereafter, Mr. Sollon would be required to show that he was disabled from "any occupation or employment for wage or profit for which he is or becomes reasonably qualified by training, education or experience."  Because Mr. Sollon never applied for benefits after April 20, 2000, Hartford has never assessed his disability vis-a-vis the "any occupation" standard and, therefore, this issue is not properly before the Court.  (Hartford Brief at 19.)

Mr. Sollon argues that he did not apply for benefits during the "any occupation" period because Hartford had already

concluded he was not disabled from performing his own occupation. Thus, "there was no chance that they would have determined that he was disabled from 'any occupation' and . . . applying for such benefits to the Hartford would have been futile and a waste of time on behalf of Mr. Sollon."  (Plf.'s Opp. to Hartford at 11.) He also argues that the Hartford "conveniently fails" to address the futility exception to the exhaustion requirement "when it is clear that plaintiff's claim would be denied administratively." (Id. at 13.)

    Plaintiff attempts to distinguish the cases relied on by Hartford – D'Amico v. CBS Corp., 297 F.3d 287 (3d Cir. 2002); Harrow v. Prudential Ins. Co. of Am., 279 F.3d 244 (3d Cir. 2002); and Weldon v. Kraft, Inc., 896 F.2d 793 (3d Cir. 1990) – by arguing that in those cases, "the plaintiffs did not even make it known [sic] their desire for benefits to a responsible company official in the first place."  (Plf.'s Opp. to Hartford at 12.) Briefly stated, in D'Amico, the plaintiffs argued they never presented their claims to the plan administrator because there was a "longstanding policy" by the administrator that the partial termination of the plan on which their claims were based had never occurred.  In Harrow, the plaintiff made one telephone call to an unidentified plan administrator before filing suit, even though he had the plan booklet which explained how to file a complaint when benefits were denied.  Weldon does not address the

57

futility doctrine directly, but is rather a case in which the plaintiff argued he should have been "deemed" to have exhausted his administrative remedies because his attorney and his employer's in-house counsel were "in contact" regarding his ERISA claim.  In each of those cases, the court concluded that the plaintiffs had not exhausted their administrative remedies before filing suit and thus their claims were barred.

With exceptions not applicable here,[16] the general rule of the Third Circuit is that "a federal court will not entertain an ERISA claim for denial of benefits unless the plaintiff has exhausted the remedies available under the plan." Weldon, 896 at 800; D'Amico, 297 F.3d at 291.  However, a plaintiff is excused from exhausting his administrative remedies when resort to such remedies would have proved futile.  Berger v. Edgewater Steel Co., 911 F.2d 911, 916 (3d Cir. 1990).  A plaintiff must make a "clear and positive showing of futility" to "merit waiver of the exhaustion requirement" (Harrow, 279 F.3d at 249), and conclusory allegations of futility will not suffice.  Menendez v. UFCW Local 888 Health Fund, CA No. 05-CV-1165, 2005 U.S. Dist. LEXIS 17034, *7 (D. N.J. Aug. 11, 2005) (a conclusory statement "that amounts to nothing more than a bare allegation of futility" is insufficient to excuse the exhaustion requirement.)

As Plaintiff points out, in determining if the futility

---

[16] *See* Zipf v. AT&T, 799 F.2d 889, 893 (3d Cir. 1986).

exception applies to a particular case, a court weighs:

> (1) whether plaintiff diligently pursued administrative
> relief; (2) whether plaintiff acted reasonably in
> seeking immediate judicial review under the
> circumstances; (3) existence of a fixed policy denying
> benefits; (4) failure of the insurance company to
> comply with its own internal administrative procedures;
> and (5) testimony of plan administrators that any
> administrative appeal was futile.

(Plf.'s Opp. to Hartford at 13, *quoting* Harrow, 279 F.3d at 250.)

    While the Harrow list is by no means comprehensive, we shall
be guided by those factors in reaching the conclusion that
Plaintiff has not established the futility of exhausting his
administrative remedies with regard to a claim for LTD benefits
during the "any occupation" period.  First, he has come forth
with no evidence that Hartford had a "fixed policy" of denying
LTD benefits during the "any occupation" period.  Second, there
is no evidence that Hartford failed to comply with its internal
administrative procedures or any evidence that plan
administrators advised or intimated to Mr. Sollon that LTD
benefits would be denied or that administrative appeal of such a
decision would be futile.  By his own admission, Plaintiff never
pursued a claim for LTD benefits during the "any occupation"
period beginning April 20, 2002, even though the decision to
terminate benefits during the "own occupation" period had not
been resolved at that time.  We find that contrary to his
argument that he is unlike the plaintiffs in D'Amico or Harrow,
he is exactly like them in that he never initiated a claim for

the benefits he now seeks.

Summary judgment is granted to Hartford with regard to Plaintiff's claims for benefits during the "any occupation" period.

2.   *Damages Not Available under ERISA:* Hartford argues that Mr. Sollon is not entitled to seek damages outside the remedies provided by statute, that is, recovery of accrued benefits, a declaratory judgment on entitlement to benefits, equitable relief enjoining a plan administrator from improperly refusing to pay benefits, or attorneys fees.  (Hartford Brief at 21.)  This limitation would explicitly exclude Plaintiff's claim for an alleged reduction in the value of his pension.  (Id.)  Mr. Sollon does not address this issue in his response to the motion for summary judgment and the Court finds that such a claim is outside the exclusive, enumerated remedies of ERISA.  *See* Aetna Health Inc. v. Davila, 542 U.S. 200, ___, 124 S. Ct. 2488, 2499 (2004) ("The limited remedies available under ERISA are an inherent part of the careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans.")

Summary judgment is granted to Hartford with regard to Plaintiff's claim for damages arising from the alleged reduction in the value of his pension.

3.   *Offset of LTD Benefits by "Other Income Benefits:"*

60

Finally, we come to an argument raised by Hartford which intertwines with one made by Plaintiff concerning fiduciary duty on the part of Ms. Aumann, arising from advice she gave him when he was considering retirement options. We will begin with a summary of the provision regarding "Other Income Benefits" as that term is defined and applied in the Plan.

> As explained in the Summary Plan Description,
>
> [T]he LTD Plan will guarantee you an income from all sources equal to 66 2/3 % of your base monthly pay **including other monthly income benefits,** but excluding compensation from commissions, bonuses and overtime hours.  This does not necessarily mean that your monthly benefit under the LTD Plan equals 66 2/3 % of your base monthly pay because if you are receiving other benefits, your benefits under the LTD Plan may be reduced . . . **Other monthly income benefits include all amounts from Social Security, . . . as well as formal benefits or payments provided by or through [Ohio Casualty].** . .    Your income from the Plan will be reduced by the amount paid for by those benefit sources, including those for which you may be eligible but have failed to apply for.

(Plf.'s App., Summary Plan Description at LTD-6, emphasis added.)

Other Income Benefits explicitly includes "disability or retirement benefits provided for under any group insurance or pension plan."  (Insurance Policy, Definitions.) Another provision of the Plan carves out an exception to this general rule in that a claimant "shall not be required to apply for retirement benefits available only on a reduced basis."  (Id.)

Hartford claims that Mr. Sollon became eligible to receive pension payments from Ohio Casualty in October 1999 when he

61

stopped working.  Consequently, LTD benefits for the period April 2000 (when he began receiving benefits from Hartford rather than from Ohio Casualty's salary continuation plan) through the termination of those benefits should be offset by the amount he could have received from his pension.  (Hartford Brief at 20-21.)

Plaintiff, rather disingenuously, argues that his pension benefits do not qualify as Other Income Benefits because they are "totally unrelated" to his disability.  (Plf.'s Opp. to Hartford at 13-14.)  That argument totally misses the mark because there is no requirement that the income from other sources be "related to" the disability; in fact, the definition includes such disparate sources as unemployment compensation and no-fault insurance payments.  He also claims that his LTD benefits should not be offset by pension benefits which he did not begin receiving until December 2004.  (Id. at 15.)  That argument also misses the mark because the definition of Other Income Benefits explicitly includes those for which an LTD benefit claimant is eligible, whether or not such income is actually received.

Hartford relies on an affidavit from Ms. Aumann in her capacity as manager of the Employees Retirement Plan for Ohio Casualty to support its argument.  (Hartford App., Aumann Affidavit.)  Ms. Aumann explains therein that the retirement plan contemplates four options available to married employees such as Mr. Sollon.  Three of the four options provide benefits to the

surviving spouse; accordingly, monthly benefit payments are reduced to allow for the possibility that the insurer will be paying benefits for a longer period of time.  (Aumman Aff., ¶¶ 12-14.)  The only option which does not reduce monthly benefits is the Straight Life Annuity Option.  However, because this option entirely excludes benefits for a surviving spouse, the spouse must provide a notarized consent form agreeing to this option.  (Id., ¶¶ 8.)

It appears, therefore, that without spousal consent, the only retirement options available are those which provide benefits on a reduced basis.  Neither Ohio Casualty nor Hartford has explained – and the Court is unable to discern from the evidence before it – what effect, if any, the requirement for spousal consent in order for a plan participant to receive the only unreduced retirement benefit through the Employee Retirement Plan has on the carve-out in the LTD Plan.[17]

Even if this question were resolved, however, there is a further complication.  Plaintiff claims summary judgment in Hartford's favor should be denied because a letter from Ms. Aumann dated March 11, 2005, "sets forth a diametrically opposed position pertaining to [his] pension benefits . . . and their interplay with Long Term Disability benefits from that of The

---

[17]  Although Hartford specifically cites the example of Plaintiff receiving benefits under the Straight Life Annuity Option, the requirement of spousal consent to this option is not addressed. (Hartford Brief at 21.)

Hartford, as expressed in its Brief." (Plf.'s Opp. to Hartford at 15.)  In that letter, Ms. Aumann states that

> On November 23, 2004, we indicated that commencement and receipt of ERP [Employee Retirement Plan] benefits would not preclude future disability payments (although the disability benefits would be reduced by the ERP benefit), should it be determined that Mr. Sollon continued to be disabled under the terms of the Hartford LTD policy.  This is not correct.  Under the Hartford LTD policy, receipt of pension benefits, such as ERP benefits, renders an insured individual ineligible for payment of any disability benefits. Thus, the terms of the Hartford LTD policy preclude any disability benefit entirely – even upon a determination that an insured is "totally and permanently disabled" – *if* the insured is receiving pension benefits.

(Plf.'s App., Letter of Ohio Casualty.)

The Court agrees with Plaintiff that there is a major inconsistency between Ms. Aumann's letter of March 11, 2005, and the argument made by Hartford in its brief.  Hartford's argument assumes that Mr. Sollon's LTD benefits should have been <u>reduced</u> when he began receiving (or could have received) benefits from the Employees Retirement Plan; Ms. Aumann's analysis assumes that beginning to receive pension benefits <u>terminates</u> LTD benefits from Hartford.  Although Mr. Sollon claims he did not begin receiving pension benefits until December 2004, the same question of whether LTD benefits should be terminated or reduced would seem to apply if Mr. Sollon were eligible for unreduced pension benefits as of October 1999 as Hartford claims.

Based on the evidence currently before it, the Court is unable to determine when Mr. Sollon was eligible for any Other

Income Benefits on an unreduced basis which would offset the LTD benefits payable by Hartford for the period April 20, 2000, through August 17, 2001.  This matter must therefore be remanded to Hartford for initial calculation.  Summary judgment is denied without prejudice pending resolution of the above questions.  An appropriate Order follows.


<u>S/William L. Standish</u>
William L. Standish
U.S. District Judge


cc:  Ronald H. Heck, Esq.
     100 Wood Street Building
     Fifth Floor
     Pittsburgh, PA   15222

     J. Alan Lips, Esq.
     Rachel S. Zahniser, Esq.
     Taft, Stettinius & Hollister
     425 Walnut Street
     1800 Star Bank Center
     Cincinnati, OH 45202-3957

     Randy K. Hareza, Esq.
     Sheila M. Burke, Esq.
     Burns, White & Hickton
     106 Isabella Street
     Four Northshore Center
     Pittsburgh, PA 15212-3001
     E-mail: rkhareza@bwhllc.com
     Email: smburke@bwhllc.com

     Kristy Rizzo, Esq.
     Pepper Hamilton
     500 Grant Street
     50th Floor, One Mellon Bank Center
     Pittsburgh, PA   15219

Brian P. Downey, Esq.
Pepper, Hamilton & Scheetz
200 One Keystone Plaza
P.O. Box 1181
Harrisburg, PA   17108-1181
E-mail: downeyb@pepperlaw.com

William M. Hassan, Esq.
Kleet, Rooney, Lieber & Schorling
One Oxford Centre
40th Floor
Pittsburgh, PA   15219
E-mail: wmhassan@klettrooney.com